UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| MICHAEL H. GELFAND, | Case No. 13-CV-1290 (PJS/JJK) |
| Plaintiff, | |
| v. | ORDER |
| METROPOLITAN LIFE INSURANCE COMPANY, a New York Corporation d/b/a MetLife; CITADEL BROADCASTING COMPANY, by way of merger, Cumulus Broadcasting, LLC, a Nevada Limited Liability Company; and CUMULUS MEDIA, INC., a Delaware Corporation, | |
| Defendants. | |

---

Benjamin Robert Garbe and Amanda R. Cefalu, ANDERSON, HELGEN, DAVIS & NISSEN, P.A., for plaintiff.

William D. Hittler, NILAN JOHNSON LEWIS P.A., for defendants.

Plaintiff Michael H. Gelfand participated in an employee welfare benefit plan ("the Plan") sponsored by his employer, defendant Citadel Broadcasting Company ("Citadel"),[1] and established pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. Defendant Metropolitan Life Insurance Company ("MetLife") insures the Plan. Gelfand brings this lawsuit seeking review of MetLife's decision to deny his claim for long-term disability benefits under the Plan. Gelfand also seeks equitable relief from MetLife, Citadel, and Citadel's parent company, defendant Cumulus Media, Inc. ("Cumulus").

---

[1]In 2011, Citadel Broadcasting Company was purchased by Cumulus Media, Inc. and renamed "Cumulus Broadcasting, LLC." *See* Compl. ¶ 5 n.1 [ECF No. 1]. For sake of clarity, the Court will refer to both Citadel Broadcasting Company and Cumulus Broadcasting, LLC as "Citadel."

This matter is before the Court on the parties' cross-motions for summary judgment. For the reasons explained below, the Court concludes that MetLife abused its discretion in denying Gelfand's claim for long-term disability benefits. Accordingly, the Court grants the bulk of Gelfand's motion for summary judgment with respect to MetLife and remands this case to MetLife for further proceedings consistent with this order. But the Court grants defendants' summary-judgment motion with respect to Citadel and Cumulus.

## I. FACTS

The parties are mostly in agreement as to the relevant facts of this case, which are briefly as follows:

Gelfand suffers from delayed sleep-phase syndrome ("DSPS"). Gelfand does not feel tired during nighttime hours, when most people experience the need to sleep. Instead, Gelfand's natural sleep rhythm causes him to feel tired during the morning and early afternoon. *See* Defs' Ex. A ("Ex.") at 521-22.[2] The date of the onset of Gelfand's DSPS is not clear, but his condition was serious enough in 2010 that he sought treatment from Dr. John Damergis, Jr. and Dr. Richard E. Golden. *See id*. at 227-29. Those doctors noted that, at that time, Gelfand's "typical sleep/wake cycle is to sleep from 7:00 a.m. to 4:00 p.m." *Id*. at 227. Damergis and Golden also described Gelfand's DSPS as "severe." *Id*. at 228. Other doctors have since substantially confirmed the findings of Damergis and Golden. *See, e.g.*, *id*. at 496-98 (attending physician statement of Dr. Ronald Groat); *id*. at 509-16 (attending physician statement and supporting documentation of Dr. Paul Sutter).

---

[2]Exhibit A to defendants' memorandum in support of their motion for summary judgment is consecutively paginated across eight docket entries. *See* ECF Nos. 32-39. For all references to this exhibit, the Court cites to the consecutive pagination at the bottom of the exhibit.

At the time of the 2010 diagnosis, Gelfand was employed by Citadel as a radio announcer on the KQRS-FM morning show in the Twin Cities region of Minnesota. *See* Compl. ¶ 5 [ECF No. 1]. Because Gelfand worked during a morning show, his job required him to be alert at precisely the time that his DSPS was causing him to fall asleep. By December 30, 2011, Gelfand's DSPS had become so severe that he quit his job at Citadel. *See* Ex. at 482. Shortly thereafter, Gelfand filed a claim with MetLife for long-term disability benefits pursuant to the Plan. *See id.* at 538 (acknowledging receipt of Gelfand's claim). Gelfand alleged a disability onset date of December 31, 2011. *Id*. at 482.

Whether a claimant is "Disabled" under the Plan turns on the extent of the claimant's residual earning capacity following the onset of his illness or injury. To be eligible for long-term disability benefits during the 24 months following the Plan's elimination period,[3] a claimant must be unable to earn more than 80% of his predisability earnings at his "Own Occupation" from any employer in his local economy. Ex. at 625. (Gelfand earned $66,000 per year from Citadel at the time that his employment with Citadel ended. *See id*. at 187.) Claimants may also receive long-term disability benefits after the conclusion of the 24 months following the elimination period, but the Plan is significantly more restrictive with respect to such benefits. First, the income threshold is reduced from 80% of predisability earnings to 60% of predisability earnings. *Id*. at 625. Second, the scope of relevant employment is expanded from the claimant's "Own Occupation" to "*any* gainful occupation for which You are reasonably qualified . . . ." *Id*. (emphasis added).

---

[3]The Plan defines "Elimination Period" as "the period of Your Disability during which We do not pay benefits." Ex. at 625. Gelfand's elimination period was the 180-day period that followed the onset of his disability. *Id*. at 620.

MetLife denied Gelfand's claim for long-term disability benefits in a letter dated August 7, 2012. *See id*. at 482-85. According to MetLife, Gelfand had not submitted sufficient medical documentation to support his claim that "unpredictable sleep patterns" had prevented him from working at his occupation, which MetLife defined as "Announcer." *Id*. at 483-84. MetLife noted in its denial letter that individuals in Gelfand's occupation of "Announcer" were not limited to morning work, but instead "may be hired to perform any shifts." *Id*. at 484. MetLife's denial letter said nothing about Gelfand's residual earning capacity after the onset of his DSPS; it focused solely on his medical condition.

Gelfand appealed the denial of his claim for benefits to MetLife's appeals department. *See* Ex. at 220-26. In his appeals letter, Gelfand argued that MetLife had wrongly defined his occupation as "Announcer." Gelfand argued that his "position was that of a morning show radio personality — not a local disc jockey who would merely plug the space between records and commercials." *Id*. at 224. Gelfand further argued that the medical evidence in the record overwhelmingly showed that his DSPS caused him to be unable to work during the morning, and thus argued that he was completely unable to perform his occupation of "morning show radio personality." *Id*. at 225-26.

MetLife determined on appeal that "the medical documentation does establish that Mr. Gelfand has some restrictions and limitations that would preclude him from performing his own job as a morning show personality from 5:00 a.m. to 9:00 a.m." *Id*. at 134. Despite those "restrictions and limitations," however, MetLife concluded that Gelfand remained capable of finding employment as a radio announcer earning more than 80% of his predisability income. *Id*. MetLife's sole evidence as to Gelfand's residual earning capacity was an "Own Occupation

-4-

Analysis and Labor Market Analysis" prepared by Vocational Rehabilitation Consultant Susan M. Sineni. *Id*. at 187-191. In her report, Sineni concluded that "[g]iven Mr. Gelfand has worked as a Radio Announcer for 25 years, it is reasonable that he would qualify for earnings at the 90th percentile and be able to negotiate this wage and higher given his experience and notoriety." *Id*. at 190. Purporting to cite wage data from the Bureau of Labor Statistics's Occupational Employment Statistics ("OES"), Sineni placed Gelfand's reasonable future earnings at $100,000 per year — that is, $34,000 per year *more* than Gelfand had earned working at Citadel. *Id*.

Following MetLife's denial of his appeal, Gelfand filed a three-count complaint against MetLife, Citadel, and Cumulus. Gelfand has since withdrawn Count Two. *See* ECF No. 45 at 3-4. In Count One, Gelfand seeks to recover long-term disability benefits under the Plan for the 24 months following the Plan's elimination period. And in Count Three, Gelfand seeks equitable relief pursuant to 29 U.S.C. § 1132(a)(2) for breach of fiduciary duties.

## II.  ANALYSIS

### A.  *Summary Judgment*

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute over a fact is "material" only if its resolution might affect the outcome of the lawsuit under the substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Id*. at 255.

### B. *Citadel and Cumulus*

The entire thrust of Gelfand's complaint is that MetLife erred in denying his claim for long-term disability benefits. For reasons that escape the Court, however, Gelfand names Citadel and Cumulus as defendants along with MetLife. The complaint does not describe what role (if any) either Citadel or Cumulus played in the denial of Gelfand's claim. Indeed, none of the three counts of the complaint even *mentions* Citadel or Cumulus. *See* Compl. ¶¶ 39-58. And the remainder of the complaint says nothing about Citadel or Cumulus, except to note that Gelfand had been employed by Citadel, that Citadel sponsored the Plan, and that Cumulus became the parent company of Citadel in 2011. *See id.* ¶¶ 3, 5, 8, 9, 18. From the face of the complaint, then, it is difficult to understand why Citadel or Cumulus were sued.

In his briefing, Gelfand concedes that Citadel and Cumulus are not proper defendants to Count One of his complaint. *See* ECF No. 45 at 2-3. As noted, Count Two of the complaint has been withdrawn. Thus, Gelfand continues to pursue only Count Three — which alleges breach of fiduciary duties — against Citadel and Cumulus. But Gelfand cannot recover under Count Three against either Citadel or Cumulus for several reasons:

First, as just mentioned, Count Three does not say a word about Citadel or Cumulus. Conversely, Count Three does allege that "[t]he administrative record demonstrates that MetLife was and is a fiduciary of the Plan and was acting in its capacity as a fiduciary in denying LTD benefits to Plaintiff," that "MetLife's denial of LTD benefits constituted a failure to act with the appropriate care, skill, prudence, and diligence under the circumstances," and that "MetLife, in denying Plaintiff LTD benefits under the Plan, breached its responsibilities, obligations, and/or duties as a fiduciary of the Plan . . . ." Compl. ¶¶ 57-58. In short, Count Three is clearly

directed at *MetLife's* alleged breach of fiduciary duties, and not an alleged breach by any other defendant.

Second, Gelfand has not alleged — either in his complaint, or in his briefing, or anywhere else — how Cumulus could be deemed to be his fiduciary. Cumulus obviously could not have breached a fiduciary duty to Gelfand if Cumulus did not *have* a fiduciary duty to Gelfand.

Third, although Citadel arguably did act as Gelfand's fiduciary (in its capacity as Plan administrator), "section 1132(a)(2) 'does not provide a remedy for individual injuries distinct from plan injuries.'" *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 593 (8th Cir. 2009) (quoting *LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 256 (2008)). Gelfand is not alleging any injury to the *Plan*. Rather, Gelfand argues that defendants injured *him* when they erroneously denied his individual claim for benefits. His claim for relief against Citadel is therefore not cognizable under § 1132(a)(2).

Finally, Gelfand has not explained how Citadel breached its duty as a fiduciary. It does not appear that Citadel played any role in denying Gelfand's claim; to the contrary, the program director at KQRS-FM — a Citadel employee — wrote a letter to MetLife that supported Gelfand's claim for disability benefits. *See* Ex. at 254-55. The Court therefore does not understand what Citadel did that, in Gelfand's view, breached a fiduciary duty. Without some explanation from Gelfand, the Court cannot find that Citadel acted in breach of a fiduciary duty.

For these reasons, defendants' motion for summary judgment as to Citadel and Cumulus is granted, and Gelfand's motion for summary judgment as to Citadel and Cumulus is denied.

### C. *MetLife's Alleged Breach of Fiduciary Duties*

Gelfand's claim that MetLife breached its fiduciary duties fails for many of the same reasons. As just explained, relief can be afforded under § 1132(a)(2) only for harms "that sweep[] beyond [the claimant's] own injury." *Braden*, 588 F.3d at 593. Gelfand is not alleging any injuries to the Plan; he alleges only that he was injured by MetLife's denial of his individual claim for benefits. Such a claim is not cognizable under § 1132(a)(2). *Id*.

In addition, Gelfand's breach-of-fiduciary-duties claim against MetLife — like his claim against Citadel and Cumulus — is woefully underdeveloped. Gelfand is unclear as to how MetLife breached any fiduciary duty owed to him, except insofar as it denied his claim for disability benefits. Likewise, Gelfand is unclear as to what injunctive relief he seeks as a result of MetLife's alleged breach of fiduciary duties, except that he asks the Court to "require that MetLife comply with ERISA when processing long-term disability benefit claims." ECF No. 40 at 35. But MetLife is already required to comply with ERISA regardless of whether this Court orders it to do so or not. "Injunctions simply requiring a defendant to obey the law are generally too vague to satisfy Rule 65(d)" of the Federal Rules of Civil Procedure. *Vallario v. Vandehey*, 554 F.3d 1259, 1268 (10th Cir. 2009) (quotations omitted). Accordingly, MetLife's motion for summary judgment is granted with respect to Gelfand's claim for breach of fiduciary duties, and Gelfand's motion for summary judgment is denied with respect to the same claim.

### D. *Claim for Benefits*

#### 1. Standard of Review

Under the Plan, "the Plan administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and

entitlement to Plan benefits in accordance with the terms of the Plan." Ex. at 705. "Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious." *Id.*; *accord Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008) (reasserting that "[w]here the plan provides . . . the administrator or fiduciary discretionary authority to determine eligibility for benefits, trust principles make a deferential standard of review appropriate" (quotations, citations, and emphases omitted)). Citing this Plan language, MetLife argues that its decision must be reviewed under the abuse-of-discretion standard — i.e., that its decision to deny Gelfand's claim for benefits must be upheld unless it was arbitrary and capricious. "Under an abuse of discretion standard," a fiduciary's decision "'will not be disturbed if reasonable.'" *Govrik v. Unum Life Ins. Co. of Am.*, 702 F.3d 1103, 1108 (8th Cir. 2013) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989)). Reasonableness is measured "'by whether substantial evidence exists to support the decision . . . .'" *Id.* at 1108-09 (quoting *Wakkinen v. UNUM Life Ins. Co. of Am.*, 531 F.3d 575, 583 (8th Cir. 2008)).

Gelfand argues, however, that the Court should review MetLife's decision de novo. Gelfand notes that the Plan grants discretionary authority only to "the Plan administrator and other Plan fiduciaries . . . ." Ex. at 705. Citadel, not MetLife, is named as the Plan administrator. *Id.* at 700. Moreover, the Plan does not define the term "Plan fiduciar[y]." Because MetLife is neither a Plan administrator nor defined as a Plan fiduciary, argues Gelfand, MetLife is not granted discretion under the Plan. (This argument is, of course, inconsistent with Gelfand's argument — addressed above — that MetLife is a fiduciary and breached fiduciary duties to him.)

The Court disagrees. Notwithstanding the Plan's failure to define "fiduciary," MetLife is clearly a fiduciary pursuant to ERISA. Under ERISA, "a person is a fiduciary with respect to a plan to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets . . . ." 29 U.S.C. § 1002(21). It was MetLife that determined that Gelfand was not disabled and therefore not entitled to benefits under the Plan. *See* Ex. at 484 (letter from MetLife long-term disability claims specialist informing Gelfand that "we have determined that your medical condition is not of a severity to preclude you from performing your job . . . ."; *id*. at 130 (appeals letter noting that "MetLife has reviewed [Gelfand's] claim for Long Term Disability (LTD) benefits" and that MetLife was denying Gelfand's appeal). In fact, there is no evidence in the record that anyone *except* MetLife made any discretionary decisions with respect to Gelfand's claim. Because MetLife made discretionary decisions with respect to Gelfand's claim, MetLife is a Plan fiduciary under ERISA. And because the Plan grants discretionary authority to Plan fiduciaries, the Court will review MetLife's denial of Gelfand's benefits claim for abuse of discretion.

2. MetLife's Denial of Benefits

The Court now turns to the crux of this lawsuit: Did MetLife abuse its discretion when it determined that Gelfand was not disabled for purposes of the Plan?

As explained above, for a claimant to be found disabled under the Plan, he must prove two things: (1) that he suffered from sickness or an accidental injury; and (2) that because of the sickness or accidental injury, he was unable to earn more than 80% of his predisability earnings at his "Own Occupation" from any employer in his local economy. *See* Ex. at 625. The first

prong is essentially a medical question; the second prong is essentially an economic question. Gelfand has the burden of submitting sufficient medical and economic evidence to prove that he is disabled under the Plan.

There is little disagreement between the parties about the first prong of the Plan's definition of "disabled." The parties do not dispute that Gelfand suffers from DSPS. Nor do the parties dispute that Gelfand is unable to work during morning hours due to his DSPS. Finally, the parties do not dispute that Gelfand is able to work during afternoon and evening hours. This is the rare ERISA case in which there is no real dispute about the claimant's medical condition.

The parties do disagree about the second prong of the Plan's definition of "disabled" — specifically, they dispute whether Gelfand was able to earn more than 80% of his predisability earnings in the Twin Cities area at his "Own Occupation" of radio announcer.[4] Again, this question is essentially economic; answering this question requires an analysis of what income Gelfand could expect to earn as a radio announcer despite being unable to work during mornings.

Unfortunately, although there is an abundance of medical evidence in the administrative record, there is almost no economic evidence. The focus of the parties at the beginning of the administrative process was on Gelfand's medical condition. The parties seem to have treated the

---

[4]Gelfand argues that his "Own Occupation" was not radio announcer, but "morning radio talk show personality." ECF No. 40 at 3. The Court disagrees. The Plan defines "Own Occupation" as "the *essential functions* You regularly perform that provide Your primary source of earned income." Ex. at 626 (emphasis added). The "essential functions" of Gelfand's job as a radio announcer are the same whether he is on the air in the morning, afternoon, or evening — just as the essential functions of a firefighter or flight attendant are the same whether the person works in the morning, afternoon, or evening. Gelfand has conceded that he could have worked as a radio announcer (albeit not in the morning) after filing his claim. Based on that concession, the Court finds that Gelfand was capable of performing his "Own Occupation."

economic considerations as an afterthought; in fact, MetLife's initial denial letter said not a word about Gelfand's earning capacity, but instead focused entirely on whether the medical evidence in the record established that Gelfand could not work as an announcer.  *See* Ex. at 482-85. Understandably, given that MetLife cited only medical evidence in denying Gelfand's claim, almost all of the evidence that Gelfand submitted in appealing that denial was medical evidence. That evidence apparently persuaded MetLife that it had erred in denying Gelfand's claim on the basis of medical considerations.

But rather than return the matter to the claims specialist so that she could solicit and evaluate evidence about Gelfand's earning capacity,[5] MetLife instead upheld the denial of benefits based on the facially implausible conclusion that, as a result of a disability that prevented him from working during morning drive-time hours, Gelfand could expect to earn over 50 percent *more* than he had earned as an announcer on a highly rated morning radio program in the Twin Cities area.  The *only* basis for this decision — that is, MetLife's decision that Gelfand was not disabled because he could earn more than 80% of his predisability income — was the "Own Occupation Analysis and Labor Market Analysis" prepared by Sineni.  *See* Ex.

---

[5]Under 29 C.F.R. § 2560.503-1(g), an adverse-benefit notification must include, among other things, "[t]he specific reason or reasons for the adverse determination" and "[a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary. . . ."  MetLife did not inform Gelfand in its initial denial-of-benefits letter that a reason for denying his claim was his residual earning capacity, and it did not alert Gelfand that additional economic evidence would be needed on appeal to perfect his claim.  Thus, not until MetLife's appeals process had concluded did Gelfand learn that MetLife's denial was based on a finding about his earning capacity.  This precluded Gelfand from receiving the "full and fair review" owed to him by MetLife under ERISA.  *See* 29 U.S.C. § 1133(2); 29 C.F.R. § 2560.503-1(h)(1); *DuMond v. Centex Corp.*, 172 F.3d 618, 622 (8th Cir. 1999) ("The purpose of this requirement is to provide claimants with enough information to prepare adequately for further administrative review . . . .").

at 187-191; Tr. at 19 [ECF No. 53]. In that report, Sineni purports to rely on 2011 OES data in concluding that due to Gelfand's "experience and notoriety," he could expect to earn $8,333.87 per month after the onset of his disability. Ex. at 190. This works out to roughly $100,000 per year — which, again, is $34,000 more than the $66,000 annual salary that Gelfand earned while working at Citadel. *See id*. at 187. Sineni's conclusion contradicted the only other economic evidence in the administrative record about Gelfand's earning capacity — a letter from KQRS-FM's program director, who explained (in essence) that Gelfand could not expect to earn the amount of income that he had earned from Citadel if he could not work during morning drive-time. *See id*. at 255 ("To approximate Gelfand's position or salary, he would need to be part of a morning radio show.").

For the reasons that follow, the Court concludes that Sineni's report does not constitute "substantial evidence" as to Gelfand's residual earning capacity, and therefore concludes that MetLife abused its discretion by relying solely on that report in concluding that Gelfand's residual earning capacity precluded a finding that he was disabled.

*First*, Sineni misunderstands the OES data on which she relies.[6] Although she claims in her report that she is looking only at wage data for radio announcers in the Twin Cities metro area, *see id*. at 190, Sineni in fact relied upon OES data that combines wage data for both radio announcers *and* television announcers in the Twin Cities metro area. There has never been a suggestion — from MetLife, from Gelfand, or from anyone else — that Gelfand is qualified to

---

[6]This data can be accessed at *Bureau of Labor Statistics Occupational Employment Statistics OES Data*, http://www.bls.gov/oes/special.requests/oesm11ma.zip (last visited June 30, 2014). The data relevant to Gelfand's claim can be found in row 20147 of the file named "MSA_M2011_dl_2_KS_NY.xls." A copy of the relevant data is on file with the Court.

work as a television announcer. It is possible — indeed, it seems likely — that television announcers earn considerably more on average than radio announcers. If that is true, then wage data that combines the salaries of radio announcers and television announcers would overstate what a radio announcer could expect to earn. Sineni does not even mention that she relied upon combined wage data for radio announcers and television announcers, much less explain why this data accurately represents what Gelfand could expect to earn in the Twin Cities market despite his lack of qualifications to work as a television announcer.

*Second*, Sineni concludes that "it is reasonable that [Gelfand] would qualify for earnings at the 90th percentile" for radio announcers. *Id*. According to the OES data cited by Sineni, radio and television announcers in the 90th percentile in the Twin Cities metro area can expect to earn approximately $100,000 per year. (Sineni references the substantially equivalent figure of $8,333.87 per month. *Id*.) The sole reason Sineni gives for concluding that Gelfand could expect to be paid more than 90 percent of radio and television announcers in the market is his "experience and notoriety." *Id*.

This is problematic for at least two reasons. First, Sineni does not provide any reason to believe that "experience and notoriety" determine what radio announcers can expect to earn. It is not at all obvious that a radio announcer's earnings can be expected to increase uniformly over time. It would instead seem possible that an announcer with little experience but high ratings would earn more than an announcer with lots of experience but low ratings. Second, although Sineni at least provides a basis for her conclusion that Gelfand has "experience" as a radio announcer, *see id*. ("Mr. Gelfand has worked as a Radio Announcer for 25 years"), she provides no basis for her conclusion that Gelfand enjoys some level of "notoriety," nor does she discuss

whether any "notoriety" enjoyed (or suffered) by Gelfand is likely to translate into a lucrative position.

Sineni's unsupported and largely unexplained conclusion that Gelfand could earn wages in the 90th percentile for radio and television announcers was crucial to MetLife's decision that Gelfand was not disabled. According to the OES wage data relied on by Sineni, the wages of radio and television announcers are highly skewed towards the top earners. Thus, Gelfand would not qualify as disabled if he could expect earnings in the 90th percentile ($100,000 per year), but he *would* qualify as disabled if he could expect earnings in the 75th percentile ($47,300 per year). Accordingly, even accepting Sineni's flawed assumptions (1) that the expected wages of radio announcers and television announcers are equivalent and (2) that "experience and notoriety" drive what radio announcers can expect to earn, Gelfand *still* would qualify as disabled if Sineni's conclusion that Gelfand could earn at the 90th percentile level was just slightly off. Yet Sineni provides no explanation for her conclusion that Gelfand's "experience and notoriety" would enable him to earn at the 90th percentile — as opposed to the 80th or 70th or 60th percentiles. For all that the record shows, Sineni (and therefore MetLife) pulled the 90th-percentile figure out of thin air.

*Third*, Sineni never grapples with the central complaint raised by Gelfand — that radio announcers working during morning drive-time (when radio audiences peak) earn substantially more than radio announcers working at other times. It is not enough for MetLife to say that Gelfand could work in the afternoons and evenings. MetLife also needs an evidentiary basis for its conclusion that Gelfand could earn more than 80% of his predisability income — income that he earned while working on a highly rated morning drive-time program — while working in the

afternoons or evenings. Even if everything else claimed by Sineni in her report was true, Gelfand might nevertheless be disabled under the plan if most of the jobs that pay enough to be "disqualifying" require work in the morning.[7]

For these reasons, the Court concludes that MetLife abused its discretion when it concluded — based solely on Sineni's obviously flawed analysis — that Gelfand was not disabled because he could earn more than 80 percent of his predisability income. Because the record contains almost no other evidence about Gelfand's residual earning capacity, the Court remands this matter to MetLife for further proceedings.[8] On remand, Gelfand should be given an opportunity to respond to Sineni's report and to submit evidence about his earning capacity. MetLife should then consider Gelfand's submissions and decide whether he has met his burden of proving that he was disabled during the 24 months following the elimination period.

### E. Attorney's Fees

Gelfand seeks an award of attorney's fees as the prevailing party in this case. *See* 29 U.S.C. § 1132(g)(1) (permitting a court to award attorney's fees under ERISA). The Court finds

---

[7]The Court also notes that, according to the OES wage data relied upon by Sineni, only 430 people work as radio and television announcers in the Twin Cities metro area. Accordingly, only 43 radio and television announcers in the Twin Cities metro area earn an income in the 90th percentile. Sineni thus concludes that Gelfand could expect to be one of only 43 announcers to earn such a lucrative income despite not being a television announcer and despite not being able to work during morning drive-time on the radio. It is very difficult to believe that this is true.

[8]Gelfand asks that the Court grant his claim for benefits rather than remand to MetLife for further proceedings. But just as there is insufficient economic evidence in the administrative record to conclude that Gelfand is not disabled, there is also insufficient economic evidence in the record to conclude that Gelfand is disabled. Remand is necessary to further develop the record as to Gelfand's residual earning capacity at the time that his employment with Citadel ended.

that such an award is warranted under the relevant factors, which include (1) the opposing party's degree of bad faith; (2) the opposing party's ability to pay; (3) deterrence; (4) the significance of the legal question; and (5) the relative merits of the parties' positions. *Nichols v. Unicare Life & Health Ins.*, 739 F.3d 1176, 1184 (8th Cir. 2014) (citing *Lawrence v. Westerhaus*, 749 F.2d 494, 496 (8th Cir. 1984)). MetLife's decision to deny Gelfand's claim for long-term disability benefits was based on facially implausible conclusions that were, in turn, based on obviously flawed data and analysis. ERISA does not demand much of an insurer in MetLife's position — basically, that it act reasonably and treat the claimant fairly — but MetLife fell far short of that standard. An award of attorney's fees will deter MetLife from such abuses of discretion in the future.

That said, the Court's award of attorney's fees is limited in two important respects. First, Gelfand is not entitled to attorney's fees for the time that his attorneys devoted to pursuing claims against Citadel and Cumulus. Second, Gelfand is not entitled to attorney's fees for the time that his attorneys devoted to pursuing claims and arguments against MetLife that were not successful, such as the claim for breach of fiduciary duty and the argument that MetLife's decision should be reviewed de novo. MetLife should not have to pay Gelfand's attorneys for pursuing meritless claims or losing arguments.

The Court therefore directs Gelfand to file an affidavit and appropriate supporting materials regarding the reasonable attorney's fees and expenses that he incurred in establishing that MetLife abused its discretion in denying his claim for benefits (as alleged in Count One of the complaint). Gelfand must file and serve that affidavit and those supporting materials no later than July 18, 2014. MetLife may file and serve a response no later than August 1, 2014.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Count Two of the complaint is WITHDRAWN.

2. The motion for summary judgment of defendants Metropolitan Life Insurance Company, Citadel Broadcasting Company, and Cumulus Media, Inc. [ECF No. 25] is GRANTED IN PART and DENIED IN PART.

    a. The motion is GRANTED as to Count Three of the complaint. Count Three is DISMISSED WITH PREJUDICE AND ON THE MERITS.

    b. The motion is GRANTED as to Count One insofar as Count One asserts a claim against Citadel and Cumulus. Accordingly, Count One is DISMISSED WITH PREJUDICE AND ON THE MERITS as to defendants Citadel and Cumulus.

    c. The motion is DENIED as to Count One insofar as Count One asserts a claim against MetLife.

3. The motion for summary judgment of plaintiff Michael H. Gelfand [ECF No. 27] is GRANTED IN PART and DENIED IN PART.

    a. The motion is DENIED as to defendants Citadel Broadcasting Company and Cumulus Media, Inc.

    b. The motion is DENIED as to the claim asserted in Count Three against MetLife.

      c.      The motion is GRANTED as to the claim asserted in Count One against MetLife.

4.    Gelfand's request for reasonable attorney's fees and costs is GRANTED against MetLife. Gelfand and MetLife must make submissions regarding the amount of those fees and costs as directed in the body of this order.

5.    This case is REMANDED to MetLife. On remand, MetLife must reopen the administrative proceedings and determine whether Gelfand qualifies for long-term disability benefits under the Plan.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: June 30, 2014                                  s/Patrick J. Schiltz
                                                               Patrick J. Schiltz
                                                               United States District Judge